UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JUDITH OCASIO,

                         Plaintiff,

          - versus -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.

MEMORANDUM
AND ORDER
12-CV-6002

APPEARANCES

       HAROLD SKOVRONSKY
           1810 Avenue N
           Brooklyn, New York 11230
           *Attorney for Plaintiff*

       LORETTA E. LYNCH
           United States Attorney
           Eastern District of New York
           271 Cadman Plaza East
           Brooklyn, New York 11201
       By:   Candace Scott Appleton
           *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        Judith Ocasio seeks review, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), of

the Commissioner of Social Security's denial of her application for Social Security Disability

Insurance ("SSDI").  The parties have cross-moved for judgment on the pleadings.  The

Commissioner seeks a judgment upholding his determination and Ocasio seeks a remand solely

for the calculation for benefits.  I heard oral argument on April 4, 2013.  For the reasons stated

below, the Commissioner's decision is reversed, and the case is remanded for further

proceedings as detailed below.

BACKGROUND

A.    *Procedural History*

Ocasio applied for SSDI on August 3, 2010, claiming disability as of February 1, 2010.  R. 98-99.  The Commissioner denied her application on September 13, 2010.  R. 51-55. Ocasio then requested, R. 63-64, and received a hearing before Administrative Law Judge ("ALJ") Eric Borda on August 22, 2011, R. 72-76.  Ocasio, who was represented by counsel, testified at the hearing, R. 31-40, as did vocational expert Rocco Meola, R. 40-46.  On October 5, 2011 the ALJ found that Ocasio was not disabled within the meaning of the Social Security Act because she retained the residual functional capacity ("RFC") to perform sedentary work, which left her unable to perform her past relevant work as an office manager but able to perform jobs existing in significant numbers in the national economy.  R. 18-19.  The Appeals Council denied Ocasio's request for review on November 1, 2012, R. 1-3, rendering the ALJ's adverse decision the final decision of the Commissioner, *see DeChirico v. Callahan*, 134 F.3d 1177, 1179 (2d Cir. 1998).

B.    *Ocasio's Statements and Testimony*

Ocasio was born in 1956.  R. 98.  She completed high school and some college. R. 31, 120.[1]  She lives with her common-law husband and two sons.  R. 35.  She worked as an office manager for a number of employers from 1990 until 2010.  R. 121.    In this role, she was required to sit for five hours, walk for two hours, and stand for one hour.  R. 122.  She was also required to write, type, or handle small objects for four hours and handle large objects for three hours.  R. 122.  She would lift and carry objects up to twenty pounds, and she frequently lifted

---

[1]      In her application for benefits, Ocasio represented that she had completed four or more years of college.  R. 120.  But at the hearing, she testified that she had completed only one year of college.  R. 31.

2

objects weighing ten pounds.  R. 122.  She stopped working on February 1, 2010 due to the alleged onset of her disability.  R. 120.

In her application for benefits, Ocasio indicated that she was 5'4" tall and weighed 185 pounds.  R. 120.  She claimed she was limited in her ability to work due to knee injury, spinal disease, and generalized arthritis.[2]  R. 120.  She reported that she received a consultation at Total Neuro Care in 2010 for a left knee injury and spinal disease.  R. 123, 126.

In September 2010 Ocasio submitted an appeal to the Commissioner's denial of her benefits.  R. 125-29.  She reported that her impairments affect her ability to care for her personal needs because she "must do everything slowly and carefully."  R. 127.  She indicated that she had returned to Total Neuro Care for treatment since her initial application for benefits and that she had received "various exams" and medication."[3]  R. 126.  She did not specify what medications she was receiving.  R. 127.

At the hearing on August 22, 2011, Ocasio testified that she worked as a clerical office manager until the onset of her disability.  R. 32.  She specified that she was in charge of supplies, attended meetings, assisted attorneys with interpretation, helped support staff, entered data, and typed.  R. 32.  She indicated that she also undertook management responsibilities, such as ensuring that employee work was completed, handling hiring and firing, and conducting clerical training.  R. 32-33.  She estimated that in a given day she spent four hours on her feet and four hours sitting.  R. 33.  She also indicated that she lifted up to twenty pounds.  R.33.

---

[2]    Arthritis is the inflammation of one or more joints.  *Arthritis*, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002223/.

[3]    The New York State Office of Temporary and Disability Assistance, the state agency responsible for obtaining information in connection with Ocasio's application for disability benefits, made requests for evidence from Total Neuro Care, but there was no response.  R. 141; Def. Mem. in Support Mot. J. Pleadings 2 n.3, ECF No. 16.

Ocasio testified that she had to stop working as a result of her left knee.  R. 34. She indicated that she "was in a lot of pain" and that it "started getting very, very hard . . . to walk."  R. 34.  She found, "It was getting very hard to get to work to perform my work, to stay at work, and to get back home was also a chore for me – for my knee."  R. 34.  She reported that she fell a couple of times at the train station because her knee would buckle.  R. 34.

In response to a question by the ALJ as to current problems with her knee, Ocasio testified that she was "in constant pain," which was "very severe."  R. 34.  She indicated that the buckling of her knee was constant and that she was "constantly falling."  R. 34.  She further indicated that she has swelling in her knee every other day.  R. 39.  She testified that she wore a knee brace.  R. 35.  She reported that she has "good days" and "bad days," and that on bad days, she uses a cane.  R. 35.

Ocasio testified that around the time she stopped working, she went to the emergency room and began seeing Dr. Answorth Allen.  R. 34.  She indicated that one doctor recommended a total knee replacement, whereas another doctor informed her that she was too young for such treatment.  R. 36.  However, she indicated that she had to stop receiving medical treatment because she could no longer afford it.  R. 35.  She had medical insurance until she stopped working and did not continue those benefits.  R. 35.  She reported that she was unsure as to whether she would opt for total knee replacement if she had insurance.  R. 36.  She indicated that her family supports her.  R. 35.  She reported taking over-the-counter (Aleve and Excedrin) medication every day for her pain.  R. 36.  She indicated that she was not taking any prescription medication because she could not afford it, and that if she could afford it, she would probably take prescribed pain medication.  R. 38.

Ocasio testified that in an eight-hour day, she would spend about five hours sitting with her leg elevated or lying down.  R. 38.  She indicated that keeping her leg elevated helped to alleviate the pain "for a little bit," but that the pain would then return "after a while."  R. 39.  She reported difficulty bathing, as she had to lift her leg and knee to get into the bathtub, and that she has fallen twice.  R. 36.  She indicated that on a bad day, she could stand for two to two and a half hours for fifteen minutes at a time.  R. 37.  She also reported difficulty kneeling and indicated that she could not kneel down on her left knee at all.  R. 37.

Ocasio testified that her common-law husband had brought her to the hearing in a car and that he would bring her home by car as well.  R. 38.  She indicated that she could not take public transportation from the hearing – in downtown Manhattan – to Staten Island where she lives.  R. 39.  She stated that it would be "too much – the subway, the stairs" and that she has "fallen numerous times."  R. 39.

C.      *Medical Evidence*

1.      *Dr. Answorth Allen*

On March 26, 2010 Ocasio underwent an initial consultation with Dr. Answorth Allen, a specialist in orthopedic surgery and sports medicine at the Hospital for Special Surgery.  R. 153-54.  Ocasio reported to Dr. Allen that she underwent knee surgery in 2003.  R. 153.  She was unable to recall the exact nature of the surgery but indicated that her patella[4] had been unstable.  R. 153.  She reported that she had recently been suffering from "chronic instability of the knee and the knee has been collapsing on her."  R. 153.  She reported "no significant knee effusion[5] or locking."  R. 153.

---

[4]      The patella is the kneecap.  *Anterior Knee Pain*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/ency/article/000452.htm.
[5]      Effusion is "[t]he escape of fluid from the blood vessels or lymphatics into the tissues or a cavity." *Effusion*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=28077.

Dr. Allen's physical examination revealed "a well-healed scar over the anterior aspect of her left knee." R. 153. He reported that she had "no active knee extension." R. 153. He found Ocasio was "tender to palpation over the inferior pole of her patella" and had "obvious patella alta."[6] R. 153. He also found "evidence of significant weakness of the extensor mechanism."[7] R. 153. He found no medial or lateral joint line tenderness or ligamentous instability. R. 153.

Dr. Allen also reviewed x-rays of Ocasio's knees, which revealed mild osteoarthritis in both knees and patella alta in her left knee. R. 155. He also found "three holes in the patella consistent with a previous patellar surgery." R. 153.

Dr. Allen's impression was that most of Ocasio's symptoms were due to a failed patellar tendon tear. R. 154. He ordered an MRI of the left knee, R. 154, which Ocasio underwent on March 28, 2010, R. 150-52.

The MRI revealed a "previous fixation of the patella with a markedly scarred and thickened extensor mechanism but no acute tear." R. 150. It further revealed "severe arthrosis[8] involving the patellofemoral compartment with complete denuding along the inferior aspect of the patella and [a] moderate degree of patella alta." R. 150-51. Finally, it revealed "[a] more mild to moderate degree of cartilage wear . . . of the medial femorotibial compartment." R. 152.

---

[6]      A patella alta refers to a high-riding patella. *Patella Alta*, RADIOPAEDIA, http://radiopaedia.org/articles/patella-alta.

[7]      The extensor mechanism refers to the quadriceps and patellar tendons, which together "facilitate leg extension (straightening)." *Knee Pain Causes, Treatments, Prevention*, WEBMD, http://www.webmd.com/pain-management/guide/knee-pain-overview.

[8]      Arthrosis refers to "[d]egenerative joint changes." *Arthrosis*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=7639.

On May 7 and 14, 2010 Dr. Allen administered Orthovisc[9] injections into Ocasio's left knee without any complications.  R. 156-57.

2.      *Dr. Chitoor Govindaraj*

On August 20, 2010 Dr. Chitoor Govindaraj consultatively examined Ocasio.  R. 131-34.  Ocasio complained of osteoarthritis and pain in her left knee and arm and reported a history of degenerative joint disease.  R. 131.  She informed Dr. Govindaraj that she sees Dr. Giovanazzo and Dr. Allen, who are both orthopedic surgeons.[10]  R. 131.  She indicated that she had undergone left knee surgery in 2003 for patellar separation by Dr. Giovanazzo at Staten Island University Hospital.  R. 131.  She reported taking over-the-counter medication, such as Aleve.  R. 131.

Dr. Govindaraj's examination of Ocasio's spine revealed no tenderness and a range of motion within normal limits.  R. 133.  He also found the range of motion of her back and joints within normal limits.  R. 133.  He reported that Ocasio could bend down and touch the floor.  R. 133.  He found her normal for a straight leg raising test.  R. 133.  He reported that her gait and posture were normal and that she did not need a cane for ambulation.  R. 133.  He did not detect any swelling or instability in her left knee.  R. 133.

Dr. Govindaraj diagnosed Ocasio with a history of left knee patellar separation in 2003, a history of degenerative joint disease of the low back, and history of arthritis of the knees. R. 133.  He opined that Ocasio was "medically stable and cleared for occupation."[11]  R. 133.

---

[9]      Orthovisc is similar to synovial fluid, which is a substance that occurs naturally in the joints and acts as a lubricant and shock absorber.  It is injected into the knee joints to treat osteoarthritis.  *Orthovisc (Hyaluronan)*, EMEDICINEHEALTH, http://www.emedicinehealth.com/drug-hyaluronan/article_em.htm.

[10]     Dr. Govindaraj's report does not provide Dr. Giovanazzo's full name.  However, an August 17, 2011 report from Dr. Bourdeau refers to a Dr. Joseph Giovinazzo (spelled slightly differently).  R. 145.  The administrative record contains no medical records from a Dr. Giovanazzo or Dr. Giovinazzo.

[11]     Dr. Govindaraj does not clarify whether Ocasio is cleared for her past occupation as an office manager or some other occupation.

7

Ocasio also underwent x-rays of her left knee on August 20, 2010.  R. 130.  The x-rays revealed patella alta and minimal spurring about the medial, lateral, and patellofemoral compartments consistent with minimal osteoarthritic change.  R. 130.  There was no evidence of fracture or effusion.  R. 130.

3.   *Dr. Fritzner Bourdeau*

On August 17, 2011 Ocasio underwent an independent consultative examination by Dr. Fritzner Bourdeau.  R. 143-46.  Ocasio stated that she had sustained an injury to her left knee after falling down the steps in her home in May 2004 and that she was subsequently diagnosed with a rupture of her left patellar tendon.  R. 143.  She reported undergoing surgery to repair the tendon by Dr. Albert Accettola, an orthopedic surgeon, on July 26, 2004.  R. 143.  She indicated that she received post-op therapy but remained unable to "stand up straight, squat, sit too long, or walk for long."  R. 143.  She stated that she had to stop working in 2010 due to the pain in her knee.  R. 143.  She reported that she was unable to ambulate properly, used a cane, and had difficulty performing activities of daily living.  R. 143.  She specifically complained of pain, instability, and buckling in her left knee.  R. 143.  She reported taking Excedrin for pain. R. 143.

On examination, Dr. Bourdeau observed that Ocasio had moderate discomfort in her left knee, trouble getting on and off the examination table, and great difficulty ambulating stairs.  R. 144.  He reported that her gait was antalgic and that she was walking with an assisted device.  R. 144.  He found that her left quadriceps muscle strength was 3/5[12] and did not detect atrophy.  R. 144.  He reported that Ocasio's left knee exhibited decreased muscle strength on flexion and extension.  R. 145.  He detected moderate swelling, effusion, and point tenderness in

---

[12]      "[A] report of atrophy should be accompanied by measurement of the strength of the muscle(s) in question generally based on a grading system of 0 to 5, with 0 being complete loss of strength and 5 being maximum strength."  20 C.F.R. Part 404, Subpart P, Appendix I, § 100(E)(1).

the left knee.  R. 145.  He found that flexion of the left knee produced crepitation[13] consistent

with ligament inflammation.  R. 145.  He reported that Ocasio had positive McMurray[14] and

Lachman[15] tests.  R. 145.   He detected signs of ligamentous instability of the left knee.  R. 145.

Finally, he reported that the straight leg raising test was positive on the right to 80 degrees and

on the left to 75 degrees.[16]  R. 145.

   Dr. Bourdeau diagnosed Ocasio with left knee derangement, left patellar tendon

repair, and severe osteoarthritis.  R. 145.  He recommended home exercises.  R. 146.  He opined

that her condition was "chronic, permanent, and totally disabling," and that Ocasio would be

unable to work due to her injuries.  R. 146.

   On the same day, Dr. Bourdeau completed a "Medical Assessment of Ability to

Do Work-Related Activities."  R. 147.  He indicated that his assessment was based both on his

physical examination of Ocasio as well as medical records provided by Ocasio.[17]  Dr. Bourdeau

reported that she could stand and/or walk less than two hours and sit less than six hours in an

eight-hour workday.  R. 148.  He also reported that she could lift/carry less than ten pounds

---

[13] Crepitation is a "[n]oise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions."  *Crepitation*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=21190.

[14] A McMurray Test is a "rotation of the tibia on the femur to determine injury to meniscal structures."  A positive test indicates meniscal injury.  *McMurray Test*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=90652.

[15] A Lachman Test is "a maneuver to detect deficiency of the anterior cruciate ligament [ACL]."  A positive test indicates injury to the ACL.  *Lachman Test*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php.

[16] A straight leg raising test is "used to rule out neural tissue involvement as a result of a space occupying lesion, often a lumbar disc herniation."  Pain "between 30-70 degrees of hip flexion is a positive result of lumbar disc herniation."  *Straight Leg Raise Test*, PHYSIOPEDIA, http://www.physio-pedia.com/Straight_Leg_Raise_Test.

[17] These medical records consisted of (1) records from Dr. Joseph Giovinazzo dated June, July, August, and September 2004; (2) an MRI report from the Department of Radiology of the Hospital for Special Surgery dated March 28, 2010; (3) an initial consultation report from Dr. Answorth Allen dated March 26, 2010; (4) an x-ray of left knee dated March 26, 2010; and (5) follow-up visit reports from Dr. Allen dated May 7 and May 14, 2010.

occasionally and was limited in her ability to push and/or pull in her lower extremities (*e.g.* operating foot controls).  R. 147-48.

D.      *Vocational Expert Testimony*

Rocco Meola testified as a vocational expert ("VE") at the hearing on August 22, 2011.  R. 40-46.  He indicated that his testimony would be based upon the regional economy, defined as New York City, Long Island, and New Jersey.  R. 41.  He further indicated that the number of jobs he would be testifying to in the region would "reflect a proportional number to the national economy."  R. 41.

Meola identified Ocasio's past work as an office manager as "skilled with an SVP of 7."[18]  He testified that while office manager work is typically "classified as sedentary in the Dictionary of Occupational Titles," Ocasio performed such work at a light level.  R. 42.

The ALJ posited a hypothetical to Meola concerning an individual of Ocasio's age, education, and work experience who could lift up to ten pounds occasionally; stand and walk for two hours and sit for six hours in an eight-hour workday; occasionally climb ramps or stairs; and occasionally balance with a handheld assistive device.  R. 42.  In addition, this individual would need to sit or stand at will, could not kneel or crawl, and must avoid all exposure to hazardous machinery and unprotected heights.  R. 42.  Meola testified that such an individual could not perform Ocasio's past work as she had performed it.  R. 43.

Meola then testified that there were transferable skills from Ocasio's past relevant work.  R. 43.  He identified these skills as the ability to use the computer and office equipment, "maintain[ ] a level of performance and be[ ] exact in terms of her work," find and organize

---

[18]      "SVP" stands for "Specific Vocational Preparation" and refers to the amount of time "required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  The SVP ranges from 1 ("short demonstration only") to 9 ("over 10 years").  A SVP of 7 corresponds to over two years and up to and including four years of preparation.  U.S. DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES app. C (4th ed. 1991).

information, evaluate situations occurring in the workplace, and deal with people on a daily basis.  R. 43.  Meola further testified that these skills transferred to other types of work falling within the RFC hypothetical posed by the ALJ.  R. 44.  He identified several examples of such work: (1) information clerk, sedentary, SVP 4; (2) production proofreader, sedentary, SVP 4; (3) registration clerk, sedentary, SVP 3; (4) assignment clerk, sedentary, SVP 5.  R. 44.  Meola estimated that there were 3,000 such jobs regionally and 50,000 such jobs nationally.  R. 44.  He was unable to break those numbers down further.  R. 44.

Ocasio's counsel then asked Meola whether the same hypothetical individual, if "limited to the requirement of lying down or sitting with their feet elevated or their left foot elevated for five out of an eight-hour working day," would still be able to perform such work.  R. 45.  Meola responded, "With that additional limitation, in my opinion, the person would not be able to perform those jobs."  R. 45.  Then Ocasio's counsel asked whether the same hypothetical individual, if limited to the requirement of lying down or sitting with their feet or left foot elevated for two and a half hours out of an eight-hour working day, would still be able to perform such work.  R. 45.  Meola responded, "Jobs that I've indicated would not permit the lying down and the person could not work with their leg elevated parallel on these types of sedentary jobs."  R. 46.

## DISCUSSION

A.    *The Legal Standard*

Under the Social Security Act, Ocasio is entitled to disability benefits if,  "by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), she "is not only unable to do [her] previous work but cannot, considering [her]

11

age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy," *id*. § 423(d)(2)(A).  The Social Security Administration's

regulations prescribe a five-step analysis for determining whether a claimant is disabled:

> First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity.  If [s]he is not, the
> Commissioner next considers whether the claimant has a severe
> impairment which significantly limits [her] physical or mental
> ability to do basic work activities.  If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations.  If the claimant has such an
> impairment, the Commissioner will consider [her] disabled without
> considering vocational factors such as age, education, and work
> experience; the Commissioner presumes that a claimant who is
> afflicted with a listed impairment is unable to perform substantial
> gainful activity.  Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's
> severe impairment, [s]he has the residual functional capacity to
> perform [her] past work.  Finally, if the claimant is unable to
> perform [her] past work, the Commissioner then determines
> whether there is other work which the claimant could perform.

*DeChirico*, 134 F.3d at 1179-80 (internal quotation marks and alterations omitted) (quoting

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v)

(setting forth this process).  The claimant bears the burden of proof in the first four steps, the

Commissioner in the last.  *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

Under 42 U.S.C. § 405(g), I review the Commissioner's decision to determine

whether the correct legal standards were applied, and whether the decision is supported by

substantial evidence.  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  The former

determination requires the court to ask whether "the claimant has had a full hearing under the

[Commissioner's] regulations and in accordance with the beneficent purposes of the Act."

*Echevarria v. Secretary of Health and Human Services*, 685 F.2d 751, 755 (2d Cir. 1982).  The

latter determination requires the court to ask whether the decision is supported by "such relevant

12

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations."  *Manago v. Barnhart*, 321 F.Supp.2d 559, 568 (E.D.N.Y.2004).  A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record."  *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir.1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

B.      *The ALJ's Rejection of Ocasio's Disability Claim*

The ALJ followed the five-step procedure outlined above for determining whether Ocasio was disabled within the meaning of the Social Security Act.  He determined first that Ocasio had not engaged in substantial gainful activity since February 1, 2010.  R. 14.  He next determined that Ocasio was afflicted with severe impairments: severe arthrosis patellofemoral compartment of the left knee; status post patellar tendon repair; and degenerative disc disease of the low back.  R. 14.

Under the third step of the analysis, the ALJ found that Ocasio's impairments did not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 14 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  The ALJ did find that Ocasio's knee impairment was "most nearly related to [L]isting 1.02A describing major dysfunction of a joint of the lower extremities."  R. 14.  But he found that the requirements were

13

not met because the knee impairment did not "result in an inability to ambulate effectively."[19]  R. 14-15.  Specifically, he found that the medical record demonstrated that Ocasio did "not require the use of an assistive device that limits the functioning of both upper extremities."  R. 15.  The ALJ also found that Ocasio's degenerative disc disease is "most nearly related to Listing 1.04 describing disorders of the spine."  R. 15.  However, he found that the requirements were not met because the medical record did not contain any evidence of "nerve root compression, spinal arachnoiditis[20], or lumbar spinal stenosis[21]."  R. 15.

The ALJ then determined that Ocasio had the RFC to perform sedentary work except that she required "the opportunity to sit or stand at will throughout the work day," could occasionally climb ramps or stairs and balance with a hand-held device, could never crawl or kneel, and had to avoid all exposure to hazardous machinery or unprotected heights.  R. 15 (citing 20 C.F.R. § 404.1567(a)).  In arriving at this determination, the ALJ considered Ocasio's statements and testimony, her medical records, and opinion evidence.  R. 15 (citing 20 C.F.R. §§ 404.1527, 404.1529).  The ALJ found Ocasio's testimony "regarding her chronic left knee symptoms and limitations was generally credible," and "largely incorporated her allegations into

---

19      An "inability to ambulate effectively" means

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Part 404, Subpart P, Appendix 1.

20      Arachnoiditis is "a pain disorder caused by the inflammation of the arachnoid, one of the membranes that surrounds and protects the nerves of the spinal cord."  *Arachnoiditis*, WEBMD, http://www.webmd.com/pain-management/guide/pain-management-arachnoiditis.

21      Lumbar spinal stenosis is "a narrowing of the spinal canal in the lower back," which "can squeeze and irritate the nerves that branch out from the spinal cord," causing "pain, numbness, or weakness, most often in the legs, feet, and buttocks."  *Spinal Stenosis of the Lower Back (Lumbar Spinal Stenosis)*, WEBMD, http://www.webmd.com/back-pain/tc/lumbar-spinal-stenosis-topic-overview.

the residual functional capacity" assessment.[22]  R. 17.  In particular, he found Ocasio's testimony "consistent with sedentary work; especially her testimony that on bad days, she is able to stand or walk for a total of two to two and a half hours in an eight-hour period."  R. 17.  He explained that, based on her testimony, he had "taken into consideration that she would require the opportunity to sit or stand at will, and never kneel."  R. 17.

The ALJ found Ocasio's testimony "largely consistent with the opinion of Dr. Bourdeau, who limited her to sedentary work."  R. 17.  But the ALJ noted that Dr. Bourdeau's assessment of "the total number of hours that [Ocasio] may sit, stand, and walk, implies that [Ocasio] would be unable to sustain a full eight hour day."  R. 17.  He observed that Dr. Bourdeau had opined that Ocasio was "limited to sedentary exertion work involving sitting for less than six hours in an eight-hour day, and standing or walking for less than two hours in an eight-hour day."  R. 17 (citing R. 147-49).  He concluded, however, that based on Ocasio's "testimony that on bad days she is able to stand or walk for a total of two to two and a half hours," his assessment that Ocasio could perform sedentary work "accurately depict[ed Ocasio]'s residual functional capacity."  R. 17.

---

[22]      Earlier in the opinion, the ALJ stated that while he found Ocasio's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," he did not find her "statements concerning the intensity, persistence and limiting effects . . . credible to the extent they are inconsistent with the above residual functional capacity assessment."  R. 16.  This statement is in tension with the later finding that Ocasio's testimony "was generally credible."  R. 17.  The prior statement is boilerplate language that, unfortunately, commonly appears in opinions rejecting claimant testimony.  *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012) ("Reading the administrative law judge's opinion, we first stubbed our toe on a piece of opaque boilerplate near the beginning, where, . . . the opinion states: '. . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.'  The government's brief describes this passage as a 'template,' by which it means a passage drafted by the Social Security Administration for insertion into any administrative law judge's opinion to which it pertains.");  *Perrin v. Astrue*, 11-cv-5110, 2012 WL 4793543, at *5 (E.D.N.Y. Oct. 9, 2012) ("In a conclusory manner, the ALJ stated that [claimant]'s 'statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.'").  Here, the ALJ did not discredit Ocasio's testimony.  Rather, he found it credible but supportive of his finding that she has the RFC to perform sedentary work.  The boilerplate language here is therefore a conclusory statement, which the ALJ inserted into his opinion without "tailoring [it] to the facts at hand, almost without regard to whether the boilerplate [language] has any relevance to the case."  *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004).

The ALJ also relied on the consultative examination by Dr. Govindaraj in support of his conclusion that Ocasio had the RFC to perform sedentary work.  The ALJ noted that Dr. Govindaraj reported that Ocasio's gait and posture were normal, that she did not require a cane for ambulation, and that the straight leg raising test was normal.  R. 16.  He further noted that Dr. Govindaraj opined that Ocasio "was medically stable and cleared for occupation."  R. 16.  With respect to Ocasio's back, the ALJ noted that Dr. Govindaraj did not report kyphoscoliosis[23], gibbus[24], or tenderness.  R. 16.  He also noted that Dr. Govindaraj reported that Ocasio's spinal range of motion was within normal limits and that she was able to bend down and touch the floor.  R. 16.

In the fourth step of the analysis, the ALJ concluded, on the basis of his RFC determination, that Ocasio was unable to perform her past relevant work as a cashier.  R. 17. Moving on to the fifth and final step, the ALJ found that considering Ocasio's age, education, work experience, and RFC, she had acquired work skills from past relevant work that were transferable to other jobs existing in significant numbers in the national economy.  R. 18 (citing 20 C.F.R. §§ 404.1569, 404.1569(a), 404.1568(d)).  His conclusion relied, in part, on the vocational expert's testimony that Ocasio had skills transferable to work falling within her stated RFC and that, "in the aggregate, there are 50,000 such jobs nationally, and 3,000 such jobs regionally."  R. 18-19.  The ALJ also considered Ocasio's age, education, work experience, and RFC in conjunction with the Medical-Vocational Guidelines.  R. 18 (citing 20 C.F.R. Part 404, Subpart P, Appendix 2).  Specifically, he found that "although [Ocasio]'s additional limitations do not allow [her] to perform the full range of sedentary work," Medical-Vocational Rule 201.15

---

[23]    Kyphscoliosis is "a combination of outward curvature (kyphosis) and lateral curvature (scoliosis) of the spine." *Kyphoscoliosis*, EMEDICINEHEALTH, http://www.emedicinehealth.com/script/main/art.asp?articlekey=4125.
[24]    Gibbus is "a deformity of spine in which there is a sharply angulated segment, the apex of the angle being posterior." *Gibbus*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php.

16

advised a finding of "not disabled" for a 53-year old individual with at least a high school

education, English language skills, and transferable work skills.[25]  R. 18-19.  Accordingly, the

ALJ concluded that Ocasio was not disabled within the meaning of the Social Security Act.  R.

19.

C.     *Analysis of the ALJ's Decision*

       1.   *The ALJ's RFC Determination*

       The RFC determination indicates "the most [a claimant] can still do despite [her]

limitations."  20 C.F.R. § 404.1545(a)(1).  In determining a claimant's RFC, an ALJ must take

into consideration her physical and mental impairments, symptoms (including pain), and "all of

the relevant medical and other evidence."  *Id*. §§ 404.1545(a)(1)-(2).  With respect to physical

impairments, an ALJ must take into consideration a claimant's ability to sit, stand, walk, lift,

carry, push and pull.  *Id*. § 404.1545(b).

       Under the treating physician rule, a treating physician's opinion about the nature

and severity of a claimant's impairments is entitled to "controlling weight" if it is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

---

[25]     The ALJ's opinion also responded to two arguments raised by Ocasio's counsel in a letter
submitted following the hearing.  R. 19, 97.  First, counsel argued that "the Regulations recognize that '[i]ndividuals
approaching advanced age (age 50-54) may be significantly limited in vocational adaptability if they are restricted to
sedentary work.'"  R. 97 (citing 20 C.F.R. Part 404, Subpart P, Appendix 2, 201.00(g)).  Second, counsel argued that
20 C.F.R. § 404.1568(d)(2)(iii) "further provides that transferability of skills is, inter alia, pegged to 'similar[ity of]
products, processes, of services."  R. 97.  He continued that the record "including the testimony of the vocational
expert, is devoid of evidence of adaptability and transferability sufficient to meet the regulatory standards."  R. 97.
       The ALJ dismissed the first argument by noting that counsel's citation of Rule 201.00(g) was
incomplete.  R. 97.  He quoted the remainder of the rule, which states "When such individuals have no past work
experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of
disabled ordinarily obtains."  R. 97.  The ALJ concluded that "[h]ere, the vocational expert testified that [Ocasio]
does have transferable skills" and that "[t]herefore, the representative's argument is without merit."  R. 19.  As to
counsel's second argument, the ALJ stated that he had "reviewed the industry descriptions for each of the jobs
identified by the vocational expert" and found "that each job deals with similar products, processes and services and
do[es] not require any additional skills for adaptability."  R. 19.  For example, he found that "the job of an
information clerk is semi-skilled and requires that the claimant answer inquiries from persons entering the
establishment," and that Ocasio's "description of her job, and the description of the job in the Dictionary of
Occupational Titles, shows that [she] acquired these skills and used them on a regular basis as part of her past
work."  R. 19.  He concluded that "the transferability of skills is pegged to similar products, processes and services."
R. 19.

inconsistent with the other substantial evidence in [the] case record."[26]  20 C.F.R. §
404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 536, 568 (2d Cir. 1993) (upholding
regulations).  Affording a treating physician's opinion controlling weight "reflects the reasoned
judgment" that treating physicians are "most able to provide a detailed, longitudinal picture of
[the claimant's] medical impairment(s) and may bring a unique perspective to the medical
evidence that cannot be obtained from the objective medical findings alone or from reports of
individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R.
§ 404.1527(c)(2).

   The treating physician rule dovetails with the ALJ's affirmative duty to develop
the administrative record.  *Tejada v. Apfel*, 197 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. §
404.1512(d).  The non-adversarial nature of a Social Security hearing requires the ALJ " to
investigate the facts and develop the arguments both for and against granting benefits."  *Sims v.
Apfel*, 530 U.S. 103, 111 (2000).  This duty exists even in cases where the claimant is
represented by counsel.  *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  Because of the treating
physician rule, the duty of the ALJ is "particularly important when it comes to obtaining
information from a claimant's treating physician."  *Devora v. Barnhart*, 205 F. Supp. 2d 164,
172 (S.D.N.Y. 2002); *id.* at 174 (collecting cases).  This obligation includes obtaining the
treating physicians' assessments of the claimant's RFC.  *Lawler v. Astrue*, No. 10-cv-3397, 2011
WL 5825781, at *7 (E.D.N.Y. Nov. 14, 2011) ("An ALJ's affirmative obligation to develop the
record also includes the obligation to contact a claimant's treating physicians and obtain their
opinions regarding the claimant's residual functional capacity.")*; Hardhardt v. Astrue*, 05-cv-
2229, 2008 WL 2244995, at *9 (E.D.N.Y. May 29, 2008) ("[T]he ALJ was obligated to ensure

---

[26]  The Regulations define "treating source" as a claimant's "own physician, psychologist, or other
acceptable medical source who provides [a claimant], or has provided [a claimant] with medical treatment or
evaluations and who has, or has had, an ongoing treatment relationship with [a claimant]."  20 C.F.R. § 404.1502.

that the record was fully developed, which would include obtaining the treating physicians' assessments of [the claimant]'s functioning.").

In evaluating Ocasio's RFC, the ALJ noted that the "the medical evidence of record is sparse because [Ocasio] lost her health insurance when she left her job and could no longer afford to pay for doctor visits." R. 16.  In fact, the only records from a treating physician are those from Dr. Allen.  R. 150-57.  These records consist of notes from an initial consultation, an MRI, and two follow-up visits; they fail to address Ocasio's functional abilities.  The ALJ's obligation to ensure the full development of the record included obtaining Dr. Allen's assessment of Ocasio's functioning.  His failure to do so constitutes a failure to fulfill his affirmative obligation to develop the record.

Aside from the failure to seek additional information from Dr. Allen, the ALJ failed to attempt to obtain the records of other physicians identified by the claimant.  For example, during her consultative examination with Dr. Govindaraj, Ocasio stated that she had been seeing Dr. Giovanazzo, another orthopedic surgeon, since 2007.[27]  R. 131.  The record indicates that the Social Security Administration made no attempt to obtain Ocasio's medical records from Dr. Giovanazzo.  R. 141.  This oversight is particularly glaring considering that Dr. Bourdeau, who conducted an independent consultative examination of Ocasio, appears to have sought, obtained, and reviewed records from both Dr. Giovinazzo and Dr. Allen during his assessment of her impairments.  R. 145, 147-48.  This too amounted to a failure to fulfill the ALJ's affirmative obligation to develop the record.

---

[27]     Dr. Govindaraj's notes indicate that Ocasio reported seeing Dr. Giovanazzo since 2007, but that he had also operated on her left knee for patellar separation at Staten Island University Hospital in 2003.  R. 131. During her independent consultative examination with Dr. Bourdeau, however, Ocasio reported that Dr. Albert Accettola had operated on her patellar tendon in 2004.  R. 143.

The ALJ's duty to develop the administrative record encompasses "not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on her functional capacity." *Devora*, 205 F. Supp. 2d at 173.  Without a treating physician opinion to support his RFC determination, the ALJ relied heavily on the testimony of Ocasio.  In particular, the ALJ emphasized repeatedly Ocasio's statement that "on bad days, she is able to stand or walk for a total of two to two and a half hours in an eight-hour period."  R. 17.  This statement, he concluded is "consistent with sedentary work."  R. 17.

The ALJ misconstrued Ocasio's testimony.  Ocasio stated that on a bad day, she can *stand*, not stand or walk, for about two to two and a half hours.  R. 37.  And while "a sedentary job is defined as one which involves sitting, a certain amount of *walking and standing* is often necessary in carrying out job duties."[28]  20 C.F.R. § 404.1567(a) (emphasis added).  Ocasio's testimony is replete with references to her difficulty walking.  She described the constant buckling of her knee, and attested to falling on multiple occasions.  R. 34, 36, 39.  While she testified that, even on bad days, she can *stand* for about two to two and a half hours, she made no indication that she could both stand and walk for that amount of time.

The ALJ also cast Ocasio's testimony as conflicting with the opinion of Dr. Bourdeau.[29]  R. 17.  The ALJ found that "Dr. Bourdeau's assessment of the total number of

---

[28]      The use of "and" as opposed to "or" is important.  If the Regulations used "or," then the fact that Ocasio could stand (even if not walk) for two to two and a half hours may be sufficient with respect to that aspect of the "sedentary work" definition.  But the use of the conjunctive means an individual must be able to both stand and walk for two to two and a half hours, and Ocasio's testimony makes no suggestion that she would be capable of doing so.

[29]      By contrast, the ALJ found Ocasio's testimony to be consistent with Dr. Govindaraj's opinion, noting in particular that Dr. Govindaraj opined that Ocasio was "medically stable and cleared for occupation."  R. 16.  In a prior opinion, I criticized the ALJ's reliance on similar phrasing by Dr. Govindaraj where the ALJ himself had found the claimant's past relevant work to entail job activities exceeding her current RFC.  *Rodriguez v. Commissioner*, 12-cv-4103, 2013 WL 1282363, at *14 (E.D.N.Y. Mar. 28, 2013).  Similarly, the ALJ has found here, based on the vocational expert's testimony, that Ocasio is unable to perform her past relevant work.  R. 17-18.

20

hours that [Ocasio] may sit, stand, and walk, implies that [Ocasio] would be unable to sustain a full eight hour day." R. 17. Specifically, Dr. Bourdeau opined that Ocasio could stand and/or walk for less than two hours a day.[30] R. 148. But an accurate reading of Ocasio's testimony, which attests to her ability to stand for only two to two and a half hours in an eight-hour day, would appear to smooth out any perceived inconsistency.

The ALJ's failure to develop the administrative record warrants remand.[31] On remand, the ALJ should develop the record by seeking an RFC assessment from Dr. Allen, as well as medical records from Ocasio's other treating physicians, including Dr. Giovinazzo. The ALJ should also develop the record by questioning Ocasio further about her impairments – in particular, her difficulty walking – and the impact of those impairments on her RFC.

CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings is denied and Ocasio's motion is granted, but only to the extent that the case is remanded to the Commissioner for further proceedings consistent with this decision.

So ordered.

John Gleeson, U.S.D.J.

Dated: April 5, 2013
          Brooklyn, New York

---

While Dr. Govindaraj may, in fact, have been referring to some other "occupation" that Ocasio might have the RFC to perform, what that occupation might be and what kinds of exertion requirements it would entail are unclear.

[30]  The use of the "and/or" construction makes ambiguous the precise contours of Ocasio's standing and walking limitations. R. 148.

[31]  Ocasio's arguments in support of her motion for judgment on the pleadings focus exclusively on step five of the ALJ's analysis. Ocasio Mem. in Support Mot. J. Pleadings 8-11, ECF No. 13. I do not address these arguments given that the ALJ's failure to develop the record at an earlier step in the analysis warrants remand.